# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 14, 2011

No. 09-30880

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

GARRETT GENE WILSON,

Defendant - Appellant

consolidated with
No. 09-30881

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ALAN VICTOR LEE,

Defendant - Appellant

consolidated with
No. 09-30904

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

WINFRED RANDOLPH JOHNSTON, JR.,

Defendant - Appellant

No. 09-30880 et al.

consolidated with
No. 09-30943

UNITED STATES OF AMERICA,

                                    Plaintiff - Appellee

v.

WILLIAM MONTGOMERY RODES, JR.,

                                    Defendant - Appellant

Appeals from the United States District Court
for the Western District of Louisiana
USDC No. 5:08-CR-379-4

Before GARZA and DENNIS, Circuit Judges.[*]

PER CURIAM:[**]

These consolidated appeals arise out of the prosecution of five persons —
defendant-appellants Garrett Wilson, Alan Lee, Winfred Johnston, Jr., and
William Rodes, Jr. (collectively "appellants"), as well as Mark Rowe, who is not
a party to this appeal — for defrauding the Bossier Parish School Board
("BPSB").  All five defendants pled guilty in federal district court to various
charges arising out of the fraud.  Appellants each raise one or more challenges

---

[*] Judge Garwood was a member of the panel that heard oral arguments but due to his
death on July 14, 2011, did not participate in this decision.  This case is being decided by a
quorum.  28 U.S.C. §46(d).

[**] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

2

No. 09-30880 et al.

to the sentences imposed by the district court. We conclude that all of appellants' claims regarding their respective sentences are without merit. Accordingly, we AFFIRM appellants' sentences.

## BACKGROUND

Wilson and Lee owned Arklatex Air Repair ("Arklatex"), an air conditioning company in Bossier Parish, Louisiana. Johnston, Rodes, and Rowe were employed by BPSB in the maintenance department. In 2004, Wilson and Lee entered into a kickback scheme with Johnston, Rodes, and Rowe, regarding the bidding process for maintenance and repair of heating, ventilation, and air conditioning ("HVAC") systems in Bossier Parish schools. Johnston was the supervisor of the HVAC section of the BPSB maintenance department and the superior of Rodes and Rowe. In exchange for kickbacks, Johnston and Rodes provided Arklatex with competitors' bids for HVAC contracts with BPSB; Arklatex would then be in a position to make a lower bid and obtain the contracts. As a result of this scheme, Arklatex received numerous BPSB HVAC contracts and a lucrative contract for emergency repair work.

To make up for the low bids, Arklatex billed for larger equipment than it actually installed, submitted invoices for equipment that it did not replace and for work in rooms that did not exist, and charged more for units than it specified in its bids. As supervisor of BPSB's HVAC program, Johnston was responsible for reviewing contractors' invoices and ensuring that the work was completed properly. He would approve invoices to be submitted for payment to a supervisor or to BPSB's director of maintenance, and Johnston's approval signified that work had been completed. Arklatex paid Johnston and Rodes for their assistance, and permitted them to conduct credit card transactions with their BPSB-issued credit cards at Arklatex, receiving cash back, with false invoices generated to cover up the fraud.

No. 09-30880 et al.

Appellants pled guilty to various counts of federal mail fraud. Following a sentencing hearing, the district court found the amount of loss attributable to the fraud to be $1,214,550.25. The Sentencing Guidelines ("guidelines") range for each defendant was 87 to 108 months. Johnston, Rodes, and Wilson each received a sentence of 87 months in prison, while the district court varied upward to 120 months with respect to Lee because of his criminal history, his personal characteristics, and his involvement in the fraud. The defendants were also ordered to pay $1,194,300.25 in restitution to BPSB.

Johnston, Wilson, Lee, and Rodes each filed a timely notice of appeal.

## DISCUSSION
### I. Johnston's Claims (Case No. 09-30904)

Johnston raises four claims: (1) that the district court's loss determination was not supported by the evidence or a proper methodology; (2) that the district court erred by concluding that Johnston was a public official, which increased his base offense level; (3) that the district court should have sentenced him below the guidelines range; and (4) that the government refused to file a motion for downward departure for an improper reason. These claims require this court to engage in a bifurcated review. *See Gall v. United States*, 552 U.S. 38, 51 (2007). First, we determine whether the district court committed significant procedural error. *Id.* Then we consider the substantive reasonableness of the sentence under a deferential abuse of discretion standard. *Id.* We conclude that Johnston's four claims lack merit.

### A.

First, Johnston argues that the district court's loss determination, which amounted to over $1.2 million, was based on an inappropriate methodology and unsubstantiated evidence. Johnston contends that a figure of $941,174, or "somewhere less than $1,000,000," is the appropriate loss amount. Johnston Br.

4

11; Johnston Reply Br. 5. The difference between the loss amount urged by Johnston and that found by the district court translates to a difference of two offense levels. U.S.S.G. § 2B1.1(b)(1)(H), (I) (2008).

Because Johnston preserved his arguments by contesting the loss determination and methodology below, we review the district court's method for determining loss de novo and the underlying factual findings for clear error. *United States v. Harris*, 597 F.3d 242, 250-51 (5th Cir. 2010). Courts need make only a "reasonable estimate" of loss. *See* U.S.S.G. § 2B1.1 cmt. n.3(C); *United States v. John*, 597 F.3d 263, 279 (5th Cir. 2010). Nevertheless, the method used "must bear some reasonable relation to the actual or intended harm of the offense." *John*, 597 F.3d at 279 (internal quotation marks and citation omitted).

The government submitted a detailed sentencing memorandum, which included charts summarizing hundreds of invoices and the government's loss amount calculations, and which was supported by exhibits, including invoices, BPSB bid invitations, and Arklatex's bids for 2006 and 2007. The district court held a hearing on the issue of the amount of loss. Citing, inter alia, the government's sentencing memorandum and the testimony of FBI Agent J.T. Coleman at that hearing, the court concluded that the government's methodology and calculations were appropriate. The court noted that the defendants failed to offer evidence that the method was improper or to provide an alternate method, and it rejected in detail the defendants' objections.

Johnston argues that the government failed to prove the amount of loss, and that the district court erroneously accepted the government's methodology and total loss figure. Johnston contends that the amount of loss should have been reduced by legitimate equipment and services rendered as well as energy cost savings due to the placement of superior units at various schools, arguments the district court rejected in detail. Johnston does not provide any analysis of

No. 09-30880 et al.

those claims or provide any alternative calculations or citations to specific record evidence in support of his arguments, nor does he identify any error in the district court's reasoning rejecting his claims. We conclude that Johnston has failed to demonstrate that the district court's methodology and loss determination were improper. *See John*, 597 F.3d at 279-81.

Johnston also contends that an audit by an expert was necessary to determine loss. This argument lacks merit. Relying on *United States v. Jones*, 475 F.3d 701, 706 (5th Cir. 2007), Johnston argues that a district court may not rely on a Presentence Report ("PSR") loss calculation based solely on unsworn assertions of the government without an audit and independent analysis. However, *Jones* involved a PSR's determination of loss without *any* analysis of the cost of actual services rendered, and based solely on unsworn assertions by the government; this court noted as one deficiency the lack of any audit or independent analysis. *Jones*, 475 F.3d at 706. Here, by contrast, the government submitted a detailed analysis of invoices showing the differences in costs between services provided and services billed, supported by the testimony of Agent Coleman and hundreds of pages of exhibits, including the invoices, contracts, and bids. This court has previously affirmed as sufficient calculations based on similar evidence. *See United States v. Ollison*, 555 F.3d 152, 164 (5th Cir. 2009).

Finally, Johnston contends that Agent Coleman's testimony required specialized knowledge under Rule 702 of the Federal Rules of Evidence and is thus subject to scrutiny under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which sets out standards for assessing the reliability of expert testimony. Johnston also contends that the court should not have accepted Coleman as an expert because there was no notice and because his credentials were not provided. However, Johnston cites no authority for the

6

No. 09-30880 et al.

proposition that an FBI agent's testimony about loss calculation for fraudulent HVAC billing must be considered under the rules governing expert testimony. In addition, the district court did *not* deem Coleman an expert, but merely cited *Daubert* as providing guidance in analyzing whether Coleman used an appropriate methodology in determining loss. Again, Johnston cites no particular flaw in this methodology. Thus, we conclude that Johnston has not shown any error regarding the amount of loss.

**B.**

Johnston next argues that the district court erred in determining that he was a "public official" within the meaning of guidelines § 2C1.1(a)(1). We disagree. The guidelines commentary to § 2C1.1 defines "public official" as follows:

> "Public official" shall be construed broadly and includes the following:
>
> (A)   "Public official" as defined in 18 U.S.C. § 201(a)(1).
>
> (B)   A member of a state or local legislature. "State" means a State of the United States, and any commonwealth, territory, or possession of the United States.
>
> (C)   An officer or employee or person acting for or on behalf of a state or local government, or any department, agency, or branch of government thereof, in any official function, under or by authority of such department, agency, or branch of government, or a juror in a state or local trial.
>
> (D)   Any person who has been selected to be a person described in subdivisions (A), (B), or (C), either before or after such person has qualified.
>
> (E)   An individual who, although not otherwise covered by subdivisions (A) through (D): (i) Is in a position of public trust with official responsibility for carrying out a government program or policy; (ii) acts under color of law or official right; or (iii) participates so substantially in government operations as to possess de facto authority to make governmental

7

No. 09-30880 et al.

> decisions (e.g., which may include a leader of a state or local political party who acts in the manner described in this subdivision).

U.S.S.G. § 2C1.1 cmt. n.1.  The district court's determination that Johnston was a public official was a matter of pure guidelines interpretation, and therefore, we review it de novo.  *See United States v. Snell*, 152 F.3d 345, 346 (5th Cir. 1998).

Johnston argues that subpart (C) of the commentary definition does not apply to him because he was "merely a shop foreman" without "the authority to allocate resources of his department or award contracts" or "to make governmental decisions by virtue of substantially participating in government operations."  Johnston Br. 23-24.  The government does not dispute Johnston's premise that the definition of "public official" requires some measure of authority, and instead contends that the record shows that Johnston possessed the requisite authority.  Gov't Br. 56-57.  The government points to the following facts in support of its argument: Johnston had "authority to approve and certify that work by an outside contractor had been completed in accordance with the terms of the contract"; "Johnston had access to bids on air condition work . . . and . . . could command $400 for each exercise of that access"; and "[h]e was able to certify that an emergency existed and that units needed to be changed out on an emergency basis."  *Id.*  Johnston does not dispute the government's assertions regarding his job duties.

We conclude that Johnston's responsibilities were such that he falls within the definition of a "public official" provided in the guidelines commentary.  We ground our determination in the structure of § 2C1.1, in case law interpreting the commentary definition, and in case law interpreting the substantively identical definition of "public official" set forth in 18 U.S.C. § 201(a)(1).[1]

---

[1] *Compare* 18 U.S.C. § 201(a)(1) ("[T]he term 'public official' means[, inter alia,] . . . an officer or employee or person acting for or on behalf of the United States, or any department,

No. 09-30880 et al.

First, the structure of § 2C1.1 is inconsistent with Johnston's argument that a "public official" must have substantial authority over government resource allocation or decision-making.[2]    In addition to the base offense level enhancement for a bribery offense by a "public official," § 2C1.1 provides a separate, larger  enhancement "[i]f the offense involved . . . any public official in a high-level decision-making or sensitive position." U.S.S.G. § 2C1.1(b)(3).  The commentary states that "'[h]igh-level decision-making or sensitive position' means a position characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." *Id.* cmt. n.4(A).  It follows that to qualify merely as a "public official," and not as a "public official in a high-level decisionmaking or sensitive position," one need *not* possess "direct authority to make decisions for, or on behalf of, a . . . government entity," nor wield "substantial influence over the decision-making process."  Further, this court has said that, in determining whether a defendant was a "public official in

agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government, or a juror[.]"), *with* U.S.S.G. § 2C1.1 cmt. n.1(C) ("'Public official' . . . includes . . . [a]n officer or employee or person acting for or on behalf of a state or local government, or any department, agency, or branch of government thereof, in any official function, under or by authority of such department, agency, or branch of government, or a juror in a state or local trial.").

[2] The parties do not debate, and we need not decide, whether merely being an "employee . . . of a state or local government," without more, is enough to make a defendant a "public official" within the meaning of § 2C1.1.  *Cf. United States v. Neville*, 82 F.3d 1101, 1104 (D.C. Cir. 1996) ("[18 U.S.C. §] 201(a)(1) has two possible readings.  Under one interpretation, 'public official' includes every [government] 'employee . . .' without further qualification. . . . Alternatively, we could read section 201(a)(1) as . . . requiring [a government employee] to act 'in an[] official function' . . . in order to qualify as a public official. . . . We need not choose between the two readings, because under either Neville is a public official.  If the first reading is correct, and every District of Columbia employee is a public official, Neville plainly qualifies . . . .  If the second reading is correct, and only employees in 'an[] official function' qualify, we must consider whether Neville performs an 'official function' for the District of Columbia government.  Without venturing a comprehensive definition of 'official function,' we have no doubt that Neville performs such a role." (final alteration in original)).

No. 09-30880 et al.

a high-level decision-making or sensitive position," an "important mark of high-level responsibility is the existence of discretion involving final decision-making authority over matters of public policy or over the expenditure of substantial sums of money." *Snell*, 152 F.3d at 347 (citing *United States v. Tomblin*, 46 F.3d 1369, 1391 (5th Cir. 1995)). Again, it follows that a mere "public official" need not have such final decision-making authority. Johnston's suggested reading of "public official" would render redundant § 2C1.1's enhancement for a "public official in a high-level decision-making or sensitive position," and we must avoid such a construction if possible. *See, e.g.*, *Dodd v. United States*, 545 U.S. 353, 370 (2005).

Second, while there is scant case law interpreting the guidelines definition of "public official," that which exists conflicts with Johnston's argument. In *United States v. Jones*, 260 F. App'x 873 (6th Cir. Jan. 24, 2008) (unpublished), a panel of the Sixth Circuit concluded that a defendant who "worked as a [state driver's] licensing clerk," *id.* at 875, and was convicted of accepting bribes from a driving school to make it easier for applicants sent by the school to obtain a driver's license, "clearly falls within the [guidelines] definition of 'public official'" because, "[a]s an official [state] employee . . . , [she] acted 'on behalf of a state agency,' and had the 'official responsibility' to issue [state] driver's licenses pursuant to a 'government program.'" *Id.* at 878. Johnston argues that "[u]nlike the defendant in *Jones*, Johnston was not placed in a . . . 'position of public trust' with 'official responsibility for carrying out a government program or policy' such as issuing driver's licenses to the public." Johnston Br. 25. We are not persuaded that the level of authority Johnston possessed is meaningfully distinguishable from that possessed by the defendant in *Jones*.

Third, case law interpreting the definition of the term "public official" in the federal bribery statute, 18 U.S.C. § 201(a)(1) — which, as explained above,

10

No. 09-30880 et al.

is nearly identical to the definition of that term in guidelines § 2C1.1 cmt. n.1(C) — further undermines Johnston's argument that he did not possess the requisite authority to be a "public official."[3] In *United States v. Thomas*, 240 F.3d 445 (5th Cir. 2001), the defendant, "a guard employed by a private entity operating a detention center under contract with the Immigration & Naturalization Service . . . contend[ed] he was not a . . . 'public official' because[] he did not have any responsibility or authority to allocate federal resources or implement federal policy . . . and . . . did not occupy a position of public trust with official federal responsibilities." *Id.* at 446 (emphases removed). This court concluded that the guard "was a 'public official', as defined by § 201(a)(1)" because, "[a]lthough he did not have any authority to allocate federal resources, [he] nevertheless occupied a position of public trust with official federal responsibilities, because he acted on behalf of the United States under the authority of a federal agency . . . ." *Id.* at 448 (citations omitted). Other cases confirm that a "public official" under § 201(a)(1) need not have more authority than Johnston had. *See, e.g.*, *United States v. Baymon*, 312 F.3d 725, 728-29 (5th Cir. 2002) (concluding that cook foreman at a federal prison who "h[eld] a position with some degree of responsibility . . . [was] not plainly outside of the definition of 'public official'"); *United States v. Neville*, 82 F.3d 1101, 1106 (D.C. Cir. 1996) (determining that District of Columbia prison guard "perform[ed] an 'official function'" and noting

---

[3] Application note 1(A) in the commentary to § 2C1.1 specifically references the definition of "public official" in 18 U.S.C. § 201(a)(1). It is clear that the guidelines commentary intended to adopt the same definition of "public official" used in that statute, and accordingly, case law interpreting "public official" under 18 U.S.C. § 201(a)(1) is informative of the meaning of the same term in § 2C1.1 of the guidelines. *Cf. United States v. Hughes*, 602 F.3d 669, 673 n.1 (5th Cir. 2010) (noting that we "'appl[y] our holdings under the residual clause of the [Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B)(ii)] to analyze the definition of crimes of violence under [U.S.S.G.] § 4B1.2, and vice versa,'" because those two provisions contain identical definitions (quoting *United States v. Mohr*, 554 F.3d 604, 609 n.4 (5th Cir. 2009))).

that "nothing in the case law support[s the] argument that . . . a . . . government employee must make policy or spending decisions" or otherwise "exercise discretion in order to qualify as [a] public official[]").

Accordingly, we conclude that the district court did not err in determining that Johnston was a "public official" under § 2C1.1(a)(1).

## C.

We next conclude that Johnston has failed to show that his sentence is substantively unreasonable. Because his sentence of 87 months is within the guidelines range, it is presumptively reasonable. *See United States v. Cooks*, 589 F.3d 173, 186 (5th Cir. 2009) (citing *United States v. Candia*, 454 F.3d 468, 473 (5th Cir. 2006)), *cert. denied*, 130 S. Ct. 1930 (2010). "When reviewing a sentence for reasonableness, the court 'will infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines.'" *Id.* (quoting *United States v. Mares*, 402 F.3d 511, 519-20 (5th Cir. 2005)). "The presumption is rebutted only upon a showing that the sentence does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors." *Id.* (citing *United States v. Nikonova*, 480 F.3d 371, 376 (5th Cir. 2007)).

Johnston argues that he cooperated with the police in making a case against one of his coconspirators and that the district court did not give him the credit that he deserved for that assistance because the government declined to exercise its discretion to file a motion for a downward departure under § 5K1.1.[4] Johnston acknowledges that "[t]he district court indicated that it had taken Johnston's cooperation into consideration" when it chose to sentence him at the

---

[4] We address below Johnston's distinct argument that the government abused its discretion in choosing not to file a § 5K1.1 motion.

bottom of the guidelines range, but argues that the district court did not give him enough credit for his cooperation. Johnston has not established any basis for rebutting the presumptive reasonableness of his within-guidelines sentence. *See id.*

Johnston also argues that the § 3553(a) factors applied to his personal characteristics and offense characteristics justified a sentence below the guidelines range. *See* Johnston Br. 27-32. These arguments fail to make the necessary showing to justify upsetting the presumptively reasonable sentence chosen by the district court. *See Gall*, 552 U.S. at 51-52; *Cook*, 589 F.3d at 186.

**D.**

We also conclude that the government did not impermissibly breach Johnston's plea agreement by refusing to file a guidelines § 5K1.1 motion for a downward departure based on substantial assistance. Johnston challenges the government's determination that his cooperation was not substantial because it led only to the prosecution of Rodes, who was less culpable than him. Johnston preserved this issue in his PSR objections, and the court addressed it at sentencing. Accordingly, as this issue implicates the government's averment under the plea agreement, review is de novo. *See United States v. Garcia-Bonilla*, 11 F.3d 45, 46 (5th Cir. 1993) (reviewing de novo a claim that failure to file a § 5K1.1 motion breached the plea agreement).

The government has discretionary authority to file a motion for a downward departure pursuant to § 5K1.1; it is not required to do so. *See id.* Although the government may bargain that discretion away, it did not do so here, as the plea agreement stated that the decision to file a motion "shall be in the sole and non-reviewable discretion of the United States Attorney." *See id.* at 47 (determining that the government was "not obligate[d] . . . to move for a downward departure" where the plea agreement provided that "'the decision

13

No. 09-30880 et al.

whether to file [a 5K1.1] motion rests within the *sole discretion* of the United States'" (alteration in original)). Nevertheless, like other discretionary decisions, a prosecutor's decision not to file a § 5K1.1 motion is reviewable if the refusal was based on an unconstitutional motive, such as race or religion. *Wade v. United States*, 504 U.S. 181, 185-86 (1992).

Johnston contends that the policy of the United States Attorney for the Western District of Louisiana of not filing a motion if a defendant's cooperation leads to an offender who is equally or less culpable is not "related to a legitimate governmental end." Johnston Br. 33 (citing *Wade*, 504 U.S. at 186-87); *see Wade*, 504 U.S. at 186 ("As the Government concedes, Wade would be entitled to relief if the prosecutor's refusal to move was not rationally related to any legitimate Government end . . . ." (citations omitted)). Johnston's reliance on *Wade*'s "legitimate Government end" language is misplaced. This court has rejected the proposition that this language permits judicial scrutiny of the government's motives absent an allegation "that the government's decision was based on . . . a constitutionally suspect reason." *United States v. Urbani*, 967 F.2d 106, 110 (5th Cir. 1992). "Absent any such suggestion," a defendant's claim that the decision was arbitrary amounts to nothing "more than his disagreement with the government's decision and an invitation to the district court to similarly disagree, which is exactly the type of judicial oversight that *Wade* . . . forbids as overly intrusive on the prosecution's broad discretion." *Id.*

Johnston also contends that the government failed to act in good faith in negotiating the plea agreement, arguing that it must have known that Rodes was less culpable and that Johnston would not receive a departure. However, we may not grant relief based on bad faith where the government retains sole discretion over the decision to file a § 5K1.1 motion. *See United States v. Solis*, 169 F.3d 224, 227 n.3 (5th Cir. 1999). Johnston's contention that the

14

No. 09-30880 et al.

government's promise induced his plea is likewise unavailing, as "[t]here can be no inducement when the Government retains sole discretion." *United States v. Aderholt*, 87 F.3d 740, 743 (5th Cir. 1996).

Accordingly, we conclude that Johnston's arguments lack merit.

## II. Wilson's Claim (Case No. 09-30880)

In his sole issue on appeal, Wilson contends that the district court erred by failing to rule on his request that his sentence run concurrently with a state parole revocation sentence. At sentencing, Wilson did not object when the court stated that it would not rule on his request. "When a defendant fails to raise a procedural objection below, appellate review is for plain error only." *United States v. Lopez-Velasquez*, 526 F.3d 804, 806 (5th Cir. 2008). In order to preserve the issue for appeal, the party "must raise a claim of error with the district court in such a manner so that the district court may correct itself and thus obviate the need for our review." *United States v. Rodriguez*, 15 F.3d 408, 414 (5th Cir. 1994). Wilson's general request did not sufficiently alert the district court to the procedural challenge he now raises. *See United States v. Mondragon-Santiago*, 564 F.3d 357 (5th Cir. 2009). We therefore conclude that he did not preserve the issue, and so we review only for plain error. *United States v. Krout*, 66 F.3d 1420, 1434 (5th Cir. 1995). To show plain error, Wilson must demonstrate error that is clear or obvious and affects his substantial rights. *See Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009). We conclude he has failed to demonstrate clear or obvious error.

Federal law dictates that "[m]ultiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently." 18 U.S.C. § 3584(a); *see also Candia*, 454 F.3d at 474-75 (stating that a district court has the discretion to order a defendant's federal sentence to run consecutively or concurrently to an undischarged state

15

No. 09-30880 et al.

sentence). By operation of Louisiana law, a defendant's state-imposed parole is deemed revoked as of the date of the commission of a new felony and a parole revocation sentence is automatically imposed without a hearing by the court or parole board. La. Rev. Stat. Ann. § 15:574.10. The statute states that the new sentence and the term of imprisonment for violation of parole will be served consecutively unless the state court directs a concurrent term. *Id.*

In 2002, Wilson was released from state prison on parole, having served a sentence for armed robbery and accessory to murder. He was still on parole when he was charged in the present case, and upon being charged he turned himself into state authorities. He was held in state custody throughout the federal proceedings in the present case. At his sentencing hearing in this case, the district court declined to rule on Wilson's request that his federal sentence be ordered to run concurrently with the sentence he would receive for violating the terms of his state parole. Before reaching its decision, the district court acknowledged "the possibility or even the likelihood" that Wilson may be subject to a consecutive state sentence. In declining to rule, therefore, the district court recognized that Wilson was likely to serve consecutive sentences, but preserved for the state district court or parole board the opportunity to order the sentences to run concurrently.

Wilson argues that the district court erred because it was not aware that Wilson's parole would be revoked without a hearing, and, as a result, the district court "unwittingly den[ied]" his request for concurrent sentencing. He provides no support for his claim that the district court was unaware of the relevant Louisiana statute. Furthermore, he overlooks the fact that the Louisiana statute also gives the state court the authority to order the sentences to run concurrently. *Id.* Moreover, regardless of whether the district court was aware of the Louisiana statute, the district court clearly foresaw the possibility — even

No. 09-30880 et al.

likelihood — that the state court would not intervene to order the sentences to run concurrently, and that therefore, the sentences would run consecutively. Thus, it cannot be said that the district court "unwittingly den[ied]" Wilson's request.

The district court properly exercised its discretion not to order concurrent sentences. That decision was not clear or obvious error.

### III. Lee's Claims (Case No. 09-30881)

Lee raises two claims: (1) that the district court improperly relied on his past arrest record when it sentenced him to 120 months in prison, which is above the guidelines range for his offense; and (2) that the government breached its plea agreement by failing to file a § 5K.1 motion for a downward departure based on substantial assistance, and by failing to inform the district court of the extent of his cooperation.

We apply a plain error standard of review to Lee's claims.[5] At sentencing, Lee objected "to the ruling of the court and to the sentence." He did not specifically object to the court's reference to his past arrest record, nor did he assert that the government's decision not to file a § 5K1.1 motion was arbitrary or improper, or assert that the government failed to advise the court of his cooperation. Lee's general objection did not give the district court notice or an opportunity to correct any of the specific claims he now raises on appeal. *Mondragon-Santiago*, 564 F.3d at 361; *Rodriguez*, 15 F.3d at 414. We therefore conclude that he did not preserve these issues for appeal, and so we review only for plain error. *Krout*, 66 F.3d at 1434; *Lopez-Velasquez*, 526 F.3d at 806; *United States v. Reeves*, 255 F3d 208, 210 & n.2 (5th Cir. 2001) (concluding that the

---

[5] We reach this conclusion despite the fact that both parties contend that the ordinary reasonableness standard of review applies to Lee's past arrest record claim, because this court decides the standard of review notwithstanding the contentions of the parties. *See United States v. Vontsteen*, 950 F.2d 1086, 1091 (5th Cir. 1992) (en banc).

No. 09-30880 et al.

defendant's mere statement that the government had agreed to recommend a particular sentence was insufficient to preserve a claim that the government's failure to make that recommendation was a breach of the plea agreement). To show plain error, Lee must demonstrate error that is clear or obvious and affects his substantial rights. *See Puckett*, 129 S. Ct. at 1429. To prove that his substantial rights were affected by the plain error, Lee must show, by a probability sufficient to undermine confidence in the outcome, that the error affected his sentence. *See Mondragon-Santiago*, 564 F.3d at 364-65. We conclude that Lee did not demonstrate plain error.

### A.

Lee first asserts that the district court improperly relied on his arrest record to impose what he characterizes as an upward departure from the guidelines range. He argues that guidelines § 4A1.3(a)(3) specifically prohibits upward departures based on prior arrests, and that this court has held that arrests are not the kind of reliable information that may justify departing from the sentencing guidelines.[6]

According to the PSR, prior to his arrest in the present case, Lee had been convicted of several crimes. These included: (1) a 1976 conviction for aggravated assault with a deadly weapon; (2) a 1979 conviction for driving while intoxicated; (3) a 1981 burglary conviction; (4) a 1981 federal conviction for possession of a firearm by a felon; (5) a 1982 conviction for theft over $10,000; (6) a 1985

---

[6] The sentencing guidelines authorize an upward or downward departure from the guidelines range if the court concludes that the otherwise applicable criminal history category is inadequate. *See* U.S.S.G. § 4A1.3. An upward departure may be warranted "[i]f reliable information indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." *Id.* "A prior arrest record itself shall not be considered for purposes of an upward departure . . . ." *Id.* § 4A1.3(a)(3); *see United States v. Williams*, 620 F.3d 483, 494 (5th Cir. 2010).

No. 09-30880 et al.

conviction for possession of methamphetamine; and (7) a conviction for a burglary that occurred in 1989. When Lee was being sentenced for the 1989 burglary, the court relied on his six prior convictions and sentenced him to prison for 24 years as a habitual offender. He served 11 years of this sentence, and was paroled in 2002. The PSR also indicated that in addition to these convictions, Lee had numerous arrests from 1975 to 1990 for various offenses, including theft, carrying a weapon, burglary, being a fugitive, and possession of burglary tools.

In the calculation of his criminal history score, Lee received three criminal history points for the 1989 burglary conviction. He did not receive any points for the six additional convictions because they all occurred more than 15 years before his arrest in the present case. *See* U.S.S.G. § 4A1.2(e). At sentencing, the district court concluded that the guidelines range of 87-108 months was insufficient under the § 3553(a) factors, opining that people "need[] to be protected from [Lee] continuing to commit crime" and that the penalties imposed on him for prior offenses had not been sufficient to give him "the message about taking money from others." The court recited his numerous past convictions and arrests, and declared that "[o]rdinary citizens" never accumulate the number of arrests that Lee had. The court also noted that Lee served only 11 years of a 24-year habitual offender sentence. The court further cited Lee's conduct in the present case, which involved defrauding public schools of $1.2 million dollars that might have been used to benefit students. The court relied on Lee's role in the offense, its magnitude, and the likelihood that he would commit further crimes, to impose "a non-Guidelines sentence . . . sometimes called a 'variance,'" and sentence Lee to 120 months in prison.

Lee was correct in arguing that district courts may not consider the "mere fact" of an arrest in imposing an upward departure from the guidelines range.

19

No. 09-30880 et al.

*See United States v. Jones*, 444 F.3d 430 (5th Cir. 2006); U.S.S.G. § 4A1.3. However, here, the district court did not impose an upward departure; it applied a variance. We have not resolved the question as to whether "it is error for a district court to consider a defendant's 'bare arrest record' in imposing a non-Guidelines sentence." *See United States v. Williams*, 620 F.3d 483, 495 (5th Cir. 2010). Because this question is unresolved, we cannot find that the district court committed "clear or obvious" error. *United States v. Rodriguez-Parra*, 581 F.3d 227, 230 (5th Cir. 2009); *see also United States v. Olano*, 507 U.S. 725, 734 (1993) ("At a minimum, court of appeals cannot correct an error pursuant to [plain error review] unless the error is clear under current law.")

Moreover, the district court did not only consider the "mere fact" of Lee's prior arrests, but rather, as in *Williams*, conducted a "lengthy and weighted discussion of other significant, permissible factors" during Lee's sentencing hearing. *Williams*, 620 F.3d at 495. The district court was permitted to, and did, rely on the nature and circumstances of Lee's offense, as well as on his history. 18 U.S.C. §3553(a)(1). The district court thoroughly analyzed the relevant facts — including Lee's extensive criminal history and the magnitude of the offense — in concluding that a guidelines-based sentence was insufficient to comply with the purposes set forth in 18 U.S.C. § 3553(a), and that a variance would be required to adequately punish Lee, deter criminal conduct, and protect the public from further crimes by Lee. Its reference to Lee's arrest record does not "impugn its conclusion that the significant variance was justified." *Williams*, 620 F.3d at 496.

**B.**

Lee next contends that the government improperly declined to file a motion for a downward departure under § 5K1.1 for his substantial assistance, and breached the plea agreement by failing to advise the district court of his

No. 09-30880 et al.

cooperation. According to Lee, the government's decision not to file a motion was arbitrary in light of the facts. He also contends that the government did not file the motion because it was punishing him for disagreeing with the government's calculation of loss. As in Johnston's case, the government expressly retained its discretionary authority to determine whether to file a § 5K1.1 motion. *See Garcia-Bonilla*, 11 F.3d at 47. Therefore, we can review the government's refusal to file the motion only if we find that the refusal was based on an unconstitutional motive. *Wade*, 504 U.S. at 185. Because Lee claims that he was being arbitrarily punished for raising what he believed to be valid objections to the loss calculations, his claim could fall within the scope of *Wade*. *See Urbani*, 967 F.2d at 109-10 (noting that certain discretionary determinations based on the defendant's exercise of statutory or constitutional rights would be improper).

However, Lee has failed to show that the government's refusal to file the § 5K1.1 motion was based on a motivation to punish him for exercising his right to challenge the government's loss calculation. In its letter explaining why it declined to file the motion, the government noted that Lee had objected to it including several particular HVAC units in its loss calculation. The government, however, went on to state that it did not decline to file the motion because of the extra work involved in verifying Lee's claim, but because government investigators discovered that Lee's claim that the units had been installed was untrue, and that the government had been right to include the units in their initial loss calculation. In addition, the government noted that Lee's repeated frivolous challenges to the government's claims of loss were therefore inconsistent with cooperation. The government opted not to file the motion because Lee provided untruthful information that resulted in the dispute. Because we conclude that the government's refusal to file the § 5K1.1 motion

21

was not based on the unconstitutional motive that Lee claims, we cannot review its decision not to file the motion.

Finally, Lee's assertion that the government breached its agreement to advise the court of his cooperation also is without merit. The district court had Lee's sentencing memorandum before it, in which Lee's counsel set out in some detail the extent of his alleged cooperation. In addition, Agent Coleman testified at Lee's guilty plea hearing that Lee had cooperated in the investigation by wearing a wire and assisting in efforts to recover assets for forfeiture and restitution. Lee does not point to any information regarding his cooperation that he believes the government failed to provide the court. He merely recites the same information that he provided in his sentencing memorandum. We conclude that there was no breach of the plea agreement. *See United States v. Hooten*, 942 F.2d 878, 884 (5th Cir. 1991) (concluding that the government did not violate the essence of the plea agreement where the district court was generally aware of the "important aspect[s] of [the defendant's] cooperation").

## IV.  Rodes' Claim (Case No. 09-30943)

Rodes contends that his within-guidelines sentence of 87 months was substantively unreasonable. Although Rodes did not expressly object to the reasonableness of his sentence after it was pronounced, he made detailed arguments before the district court that even the bottom of the guidelines range for his offense was excessive in light of the § 3553(a) factors, and his counsel objected to the sentence imposed. Thus, we conclude that he preserved his reasonableness challenge. *See Mondragon-Santiago*, 564 F.3d at 361. Because Rodes' sentence fell within a properly calculated guidelines range, it is entitled to a rebuttable presumption of reasonableness. *See Gall*, 552 U.S. at 51; *Cooks*, 589 F.3d at 186 (citing *Candia*, 454 F.3d at 473). To rebut this presumption, Rodes must show that his sentence fails to take into account a factor that should

No. 09-30880 et al.

receive significant weight, gives significant weight to an irrelevant or improper factor, or represents a clear error of judgment in balancing the sentencing factors. *Cooks*, 589 F.3d at 186.

Rodes contends that his sentence is unreasonable because it did not account for his history and characteristics, did not promote just punishment, did not take into account the wide variety of sentences available, and does not avoid unwarranted sentencing disparities. He claims that he warranted a sentence below the guidelines range because he is relatively less culpable than his co-defendants, and because of several mitigating factors, including serious health problems, alcohol abuse, family circumstances, remorse, cooperation, and his age. We consider these arguments, and conclude that Rodes has not rebutted the presumptive reasonableness of the district court's within-guidelines sentence.

The district court was in the best position to determine the relative culpability of the parties and to weigh the relevant factors and evidence. *See Gall*, 552 U.S. at 51-52. Because it has full knowledge and familiarity of the facts and the individual defendants, the district court has "an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guideline sentences than appellate courts do." *Koon v. United States*, 518 U.S. 81, 98 (1996); *see also Gall*, 552 U.S. at 51-52. We therefore are deferential to the district court's sentencing decision. *Gall*, 552 U.S. at 52.

The record supports the district court's decision to reject Rodes's lesser culpability claim. The PSR and Agent Coleman's testimony suggests that Rodes was involved in informing Lee and Wilson of the BPSB bids; that he received cash and other things of value, such as repairs to his car, notwithstanding his unsupported assertions to the contrary; and that he even complained he was not receiving as much remuneration as Johnston. He also assisted in the overall

No. 09-30880 et al.

scheme by signing off on false invoices at Johnston's direction, falsely certifying that proper equipment was in place, and failing to conduct proper inspections.

Further, Rodes' comparison of his sentence to those imposed on Johnston, Wilson, and Rowe is inapposite. They were not similarly situated to Rodes, and therefore are "not appropriate points for comparison in a reasonableness analysis." *Cooks*, 589 F.3d at 186. Wilson and Johnston received sentences at the bottom of the range because the government asserted that they provided assistance in the investigation, and even filed a § 5K1.1 motion on behalf of Wilson. There is no indication that the government similarly asserted that Rodes provided assistance or that the court had reason to believe that he had been cooperative. Rodes also fails to provide support for his allegation that he and Rowe were engaged in similar criminal conduct. The record does not indicate why Rowe received probation, though it does indicate that Johnston and Rodes were the two persons involved in the bid rigging scheme. These differences between the defendants undermine Rodes's claim of unwarranted disparity. *See id.* (concluding that the disparity between co-defendants' sentences was not unreasonable because they were not similarly situated).

Rodes argues that there are additional factors that should have influenced the district court to impose a lower sentence. First, he claims that he will not be able to receive necessary medical treatment in prison, but does not provide support for this allegation. Second, he claims that certain factors suggest that he will be unlikely to commit future crimes, but did not show that the district court failed to take these factors into account; on appeal, he merely repeats the circumstances that he presented to the district court. Both are insufficient to support a conclusion that the sentence was substantially unreasonable. Rodes did not allege that the district court gave significant weight to an irrelevant or improper factor. Finally, he did not show that the district court clearly erred in

24

No. 09-30880 et al.

its balancing of the sentencing factors. In short, he has not made the required showing to rebut the presumption that his sentence is reasonable. *See id.* Rodes simply asks this court to substitute his assessment of the evidence and § 3553(a) factors for that of the district court, which this court may not do. *See Gall*, 552 U.S. at 51-52.

## CONCLUSION

For the foregoing reasons, we AFFIRM appellants' sentences.